UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No:  1:04 CR 272 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| DEWAYNE ELLIS, | ) | |
| | ) | |
| Defendant | ) | ORDER |

Currently pending before the court is Defendant Dewayne Ellis's ("Ellis" or "Defendant") Motion to Suppress Tangible Evidence and all Oral or Written Statements and Derivative Evidence (ECF No. 29).  The court held a suppression hearing on May 27, 2005, at which Trooper Andrew Topp ("Trooper Topp") testified for the United States.  For the reasons set forth below, Defendant's Motion to Suppress is granted.

## I. FACTS

On Friday, April 16, 2004, Trooper Topp, an Ohio State Highway Patrol Trooper, was working the 11:00 p.m. to 7:00 a.m. shift.  (5/27/05 Hrg. Tr. 3-4.)  Some time after 3:00 a.m., Trooper Topp observed a white Ford Ranger truck (the "truck") traveling southbound on Interstate 71 in Ashland County, Ohio.  (*Id.* at 8.)  The truck was weaving in its lane and had crossed over the white dividing line between the shoulder and the right lane several times.  (*Id.* at 4-5.)  Trooper Topp followed the vehicle in his police cruiser, and "ran" the truck's registration plate.  (*Id.* at 5.)  The registration matched the truck, showing that it was registered to an Arthur Daugherty.  At this point,

Trooper Topp activated the lights on his police cruiser and pulled the truck over to the side of the road.[1]  The time, as recorded by the automatically activated camera on top of the cruiser, was 3:23 a.m.[2]  (*Id.* at 8; 34-36.)

Two people were in the truck: the driver was a white male in his early 70s, and the passenger was a black male closer to 30.  (*Id.* at 12, 42.)  Trooper Topp approached the vehicle from the driver's side and asked the driver if he was tired or sleepy.  (*Id.* at 8.)  The driver responded that he was a "little bit" tired.  (*Id.*)  Trooper Topp also asked the driver for his license and registration, and asked where he was coming from.  (*Id.* at 8.)  The driver provided his license and registration, and told Trooper Topp that he was coming from Cleveland.  (*Id.*)  The driver's license identified the driver as Arthur Daugherty, and this name matched the truck registration Trooper Topp had received before pulling the truck over.  (*Id.* at 9.)  Trooper Topp did not smell alcohol while standing at Daugherty's side of the car.  (*Id.* at 47.)  Moreover, Daugherty did not appear to be under the influence of alcohol.  (*Id.* at 39.)

At 3:25 a.m., Trooper Topp walked over to the passenger side of the truck and asked the passenger where he lived.  (Police Video, Def. Ex. A at 3:25:00.)  Trooper Topp also asked if the

---

[1]  The activation of the police cruiser's lights automatically activated a video camera and audio recording system.  However, the audio portion of the stop was not fully recorded; it cuts in and out throughout the stop.  Additionally, the video tape ran out of space and cut off prior to the end of the stop.  (Hrg. Tr. 6-7, 45-46.)

[2]  Trooper Topp testified that the time of the stop was 3:25 a.m. or 3:27 a.m.  (Hrg. Tr. 8, 64).  The video indicated the time of the stop was 3:23 a.m.  (Hrg. Tr. 8, 34-36, 40.)  There is some dispute over whether the time on the video was accurate.  However, for purposes of establishing the length of time between events on the videotape, the court uses and refers to the times on the video unless otherwise specified.

passenger had any identification.  (Hrg. Tr. 10.)  The passenger responded that he did not have

identification on him.  (*Id.*)  Trooper Topp then asked for the passenger's social security number,

and the passenger stated he did not know it.  (*Id.*)  Trooper Topp asked for the passenger's name and

date of birth, and the passenger identified himself as Wayne D. McCarthy, born May 9, 1973.  (*Id.*)

Trooper Topp asked the passenger "if it was odd or if he thought it was odd that he did not know

his social security number being 30 years old"; Trooper Topp did not recall the response.  (*Id.*)  The

questioning at the passenger side door lasted for one and one half minutes.  (Police Video, Def. Ex.

A at 3:25:00-3:26:30.) The passenger was respectful, and at no point combative, in his responses to

the questions.  (Hrg. Tr. 42.)  Trooper Topp did not indicate that the passenger seemed nervous in

any way.  Trooper Topp admitted there is no law in Ohio requiring a passenger in a vehicle to have

a driver's license or identification.  (*Id.* at 41.)

  At 3:26:35 a.m., Trooper Topp returned to the driver's side of the truck and commanded

Daugherty to step out of the truck and sit in the police cruiser.  (Police Video, Def. Ex. A at 3:26:35;

Hrg. Tr. 11, 44-45.)  As Daugherty exited the truck, Trooper Topp asked him if he always drove this

late.  Trooper Topp indicated that he brought Daugherty back to his cruiser because it was often hard

to smell alcohol from outside a vehicle on the side of the road.  (Hrg. Tr. 47.)  He also stated that

it was his practice to bring people he suspects may be under the influence of alcohol or drugs back

to his cruiser to "talk to them, do a little more investigation, if they have had anything to drink or

any type of illegal drug."  (*Id.* at 47.)  Daugherty complied and sat in the front passenger seat of the

cruiser.   Trooper Topp found that at times, Daugherty was difficult to understand, and that

Daugherty appeared to be hard of hearing.   (*Id.* at 32.) However, Trooper Topp did not think

Daugherty was under the influence of alcohol.  (*Id.* at 39.)

Inside the cruiser, at approximately 3:27 a.m., Trooper Topp began questioning Daugherty. The questioning continued for approximately six minutes. (Police Video, Def. Ex. A, 3:27:37 to 3:33:54.) Trooper Topp asked Daugherty a series of questions: What he was doing in Cleveland? Why did he go to Cleveland? What part of Cleveland had he been in? How did he know his passenger? Did his passenger have anything with him? (*Id.*; Hrg. Tr. 11-12, 14.) Daugherty informed Trooper Topp that his passenger had been at a friend's house in Cleveland, that the passenger had paid him $40 to take him, and that Daugherty did not know exactly which part of Cleveland he had been in or what the address was. (*Id.* at 12.) Daugherty indicated he knew the passenger because he used to take the passenger's sister to the grocery store. (*Id.*) Daugherty told Trooper Topp that he had forgotten his passenger's name, that it just didn't stick with him. (*Id.* at 48.) Trooper Topp noted that he found that unusual. (*Id.* at 13.) There is no evidence in the record that Trooper Topp asked Daugherty whether he had consumed any alcohol or drugs that evening. At this point, the time was approximately 3:29 a.m. (*Id.* at 50.)

Trooper Topp then asked if there was anything illegal in the truck, or any drugs in the truck, to which Daugherty responded "not that he knew of." (*Id.* at 13-14.) Trooper Topp continued to ask questions about the passenger, whether he had seen the passenger with illegal drugs, or whether the passenger had anything with him when they went to Cleveland, to which Daugherty responded in the negative. (*Id.* at 14.) Trooper Topp indicated that while asking such questions was "common practice" for him, it was not a standard procedure, and he had not been instructed to do so. (*Id.* at 49.)

At 3:29:40, the audio portion of the videotape malfunctioned and stopped recording. (*Id.* at 52.) When the audio resumed at 3:32:54, Trooper Topp was questioning Daugherty about what he

and his passenger were doing in Cleveland, and again asking whether Daugherty knew his passenger's name.  (Police Video, Def. Ex. A, 3:32:54.)

During the three minutes without any audio, Trooper Topp admits he was not in the process of writing or issuing a citation to Daugherty.  (Hrg. Tr. 51.)  Trooper Topp indicated that during this time, he radioed for a drug-detecting canine to be sent to his location.  (*Id.* at 57.)  He noted that "through talking to the driver, I thought it was extremely odd why they were going to Cleveland, he was being paid, did not know his passenger because of the things that I found out at that time, I thought some – some sort of criminal activity was going on."  (*Id.* at 15.)

Trooper Topp left Daugherty in the police cruiser at about 3:34 a.m. and returned to the truck to question the passenger.  In response to questioning, the passenger provided Trooper Topp with a home address in Michigan, and informed Trooper Topp that he had a valid driver's license in Michigan, but did not have it with him.  (*Id.* at 15-16.)  In response to questions about Daugherty, the passenger indicated he had paid Daugherty $50 to take him to Cleveland. (*Id.* at 84.)

At 3:36:39, Trooper Topp returned to the police cruiser and asked the dispatcher to run a check in Michigan and Ohio for the passenger's stated name and birth date.  (*Id.* at 17.)  No positive identification came back from either state.  (*Id.*)

There was no audio on the tape between 3:37 a.m. and when the tape stopped at 3:42 a.m. (*Id.* at 63.)

At some point after the tape ended, at 3:42 a.m., a backup unit arrived, and indicated that the canine unit was unavailable.  (*Id.*)  At 3:45 a.m.[3], Trooper Topp asked Daugherty for consent to

---

[3]     All times after 3:42 a.m. are not from the videotape, but from Trooper Topp's report.  Approximately nineteen minutes were recorded on the videotape.

-5-

search the truck. (*Id.* at 18, 64-66.)  Daugherty consented, but Trooper Topp did not get written consent, because he asserts that his cruiser was out of consent forms.  (*Id.* at 18, 66.)  During the search, Trooper Topp found an oily rag containing cocaine under the passenger seat.  (*Id.* at 19-20.) At 3:52 a.m., Trooper Topp placed the passenger under arrest, and completed his search, finding no additional contraband.  (*Id.* at 22, 70.)  Trooper Topp instructed Daugherty to follow him back to the Ashland patrol post, where Daugherty was interviewed and subsequently released without charges.  (*Id.* at 23-24.)

At the station, the passenger, who Trooper Topp subsequently identified as Defendant Ellis, placed a telephone call using a cordless telephone provided by the police.  (*Id.* at 11.)  Ellis made incriminating statements in this phone conversation.  The conversation was recorded.

Trooper Topp stated that it typically took approximately fifteen minutes to write a citation for weaving.  (*Id.* at 37.)  There is no record of any citation being written or given to Daugherty, or that Trooper Topp began the process of writing a citation.  (*Id.*)

## II.  LAW AND ARGUMENT

Defendant challenges the constitutionality of the stop of the vehicle, contending that the detention went beyond that which was reasonably necessary based on the reason for the stop. Defendant therefore contends that the drugs found in the vehicle and Defendant's recorded phone conversation must be suppressed as fruit of the poisonous tree.  The United States argues that the stop and detention was constitutional, that Defendant has no standing to challenge the search of the vehicle, and that the search did not violate the Fourth Amendment because there was consent.

The United States correctly notes that the standing issue presents a substantial barrier for the Defendant.  A passenger in a vehicle ordinarily has no expectation of privacy in the vehicle, and thus

does not have standing to challenge the validity of consent given by a driver of the vehicle. *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978). However, courts have distinguished standing to challenge consent from standing to challenge evidence discovered as fruit of an unlawful detention:

> We "distinguish passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest." *Eylicio-Montoya*, 70 F.3d at 1162. If the physical evidence found in the vehicles was the fruit of the defendants' unlawful detention, it must be suppressed. *Id.* at 1162-64; *United States v. Miller*, 84 F.3d 1244, 1250 (10th Cir. 1996). This requires a two part inquiry: first, whether the defendants were unlawfully detained, and second, whether the discovered evidence was the fruit of that unlawful detention. *Miller*, 84 F.3d at 1250. Only if both of those questions are answered in the affirmative will the physical evidence found in the vehicles be suppressed.

*United States v. Shareef*, 100 F.3d 1491, 1499-1500 (10th Cir. 1996); *see also United States v. Norfleet*, 2005 U.S. App. LEXIS 16936, *10 (6th Cir. Aug. 10, 2005); *United States v. McCrimmon*, 2002 U.S. Dist. LEXIS 16471, *12 (E.D. Mich. Aug. 22, 2002)). Thus, the court first examines the constitutionality of the stop and detention, and then must determine whether the search and discovery of cocaine was fruit of that detention.

### A. Initial Stop of the Truck

The court must first determine whether Trooper Topp's initial stop of the truck was constitutional. The stop of a vehicle by the police, regardless of the duration and purpose of the stop, is a seizure of persons under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 810 (1996). Accordingly, such a stop must comport with the Fourth Amendment requirement of reasonableness. *Id.* In general "an automobile stop is considered reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir.2003) (internal citations omitted). Probable cause is defined as "reasonable

grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir.1993). The Supreme Court and the Sixth Circuit have made clear that the subjective motives of a police officer are irrelevant. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 455. That is, an officer may "stop vehicles for any infraction, no matter how slight," even if the traffic violation is being used as a pretext for the stop. *Id.*

Here, Trooper Topp had probable cause to believe a traffic violation had occurred. He testified that he observed the truck weaving on the road and crossing over the line onto the shoulder, a violation of Ohio law. Because Trooper Topp had reasonable grounds to believe that a traffic violation had occurred, the stop comported with the requirements of the Fourth Amendment.

### B. Continued Detention of Defendant

Having concluded that Trooper Topp lawfully seized Defendant in the context of the traffic stop, the court must determine whether the continued detention and seizure of the truck and its passengers was unreasonable and thus unconstitutional. Even though the seizure was "lawful at its inception," such a seizure "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 125 S.Ct. 834, 837 (2005). Indeed, the Supreme Court recently held that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*; *see also United States v. Valdez*, 2005 U.S. App. LEXIS 21044, *9-*10 (6th Cir. Sept. 26, 2005); *United States v. Richardson*, 385 F.3d 625 (6th Cir. 2004); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). In *Hill*, the Sixth Circuit opined that "once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the

-8-

stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."  195 F.3d at 264.

Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop.  *See Terry v. Ohio*, 392 U.S. 1, 21 (1968).  Whether an officer formed the requisite reasonable, articulable suspicion during a traffic stop is based on the totality of the circumstances. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (en banc).  A district court must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately. *United States v. Sokolow*, 490 U.S. 1, 9 (1989).  Reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

In this case, the driver's actions immediately after the initial traffic stop did not give rise to any articulable or reasonable suspicion of criminal activity.  Trooper Topp pulled the truck over for weaving.  When he pulled over the truck, the driver's license and registration matched up with the tags the trooper had run before he pulled the vehicle over.  The driver said and did nothing to raise any suspicion of illegal activity.  He was not nervous.  He answered all questions.  Moreover, Trooper Topp did not smell any alcohol coming from the vehicle, and admitted he did not think Daugherty was under the influence of alcohol.  Trooper Topp asked the driver if he always drove late at night; however, late night travel is not inherently suspicious. *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002).  Daugherty's initial actions and answers provided no reason for Trooper Topp to be at all suspicious.

The passenger's actions and answers to Trooper Topp's initial questions also did not give rise to any reasonable suspicion. Ellis was not combative in his answers, and there is nothing on the record suggesting he was nervous, shifting, or suspicious in his demeanor. While Trooper Topp found it strange that the passenger had no identification or driver's license and did not know his social security number, the court does not find this raises any suspicion. It is not illegal to be a passenger in a vehicle and not have identification or a driver's license, and it is not a legal requirement for all citizens to memorize their social security number. Moreover, the fact that a person could not recite his social security number at 3:30 a.m. on the side of the highway does not arise to suspicious behavior. At the time Trooper Topp ordered Daugherty to go back to the police cruiser, he had no reasonable suspicion of any criminal activity on the basis of his initial conversations with Daugherty or Ellis.

Trooper Topp's stated justification for bringing Daugherty back to the police cruiser was to see if he smelled alcohol on his breath. He did not smell any alcohol, and indicated that Daugherty did not appear drunk. At this point, if Trooper Topp continued to suspect Daugherty was drunk, he could have asked him directly if he had consumed any drinks that evening, or if he had come from a bar. Trooper Topp did not ask any such questions, nor did he ask any questions relating to the reason for the stop or any forthcoming citation. In fact, Trooper Topp asked nearly no questions about Daugherty. Rather, the questions were immediately and narrowly focused on Daugherty's passenger: How did Daugherty know the passenger? Where had the passenger been? Was the passenger carrying anything with him? Did he have anything with him before? Did the passenger have any illegal drugs? Trooper Topp's questioning was not aimed at gathering any additional information related to a traffic or DUI citation. It was directed at the passenger, and at whether there

were drugs in the car.  All of an officer's actions must be "reasonably related in scope to circumstances justifying the original interference." *Hill,* 195 F.3d at 264.  Trooper Topp did not ask his questions while in the process of writing Daugherty a citation; to the contrary, the record shows that at no point did Trooper Topp issue Daugherty a citation for weaving or even start writing one. As soon as Daugherty entered the cruiser and the barrage of questions started, the original purpose for the traffic stop was forgotten, and the focus was on the passenger and on drugs.  At the time he started this line of questioning and abandoned the issues of weaving and/or drunk driving, however, Trooper Topp had *no* reasonable suspicion of any illegal activity.

This conclusion is consistent with a recent Sixth Circuit case, *United States v. Richardson*, 385 F.3d 625 (6th Cir. 2004).  In *Richardson*, a police officer pulled over a vehicle for swerving on an interstate and following a vehicle too closely.  *Id.* at 627.  The passengers appeared nervous; the driver's hand trembled as he presented his license, and another passenger's lips quivered as he spoke.  The owner of the vehicle spilled her purse on the floor as she reached for the registration. One of the occupants indicated they were coming from a meeting with a lawyer in Nashville.  The police officer asked the driver to step out of the vehicle, and went back to the police cruiser to write up a citation. When he returned, he asked the driver about his travel plans.  The driver said they had been visiting a doctor in Nashville.  The officer then gave the citation to the driver, shook his hand, and asked the driver if he would answer a few more questions.  The officer asked whether there were any drugs, money, or guns in the car, and the driver said there were not.  The officer then asked the driver to remain behind the car, and asked the owner of the vehicle, who was inside the car, for her consent to search the vehicle.  When the officer returned to the car, another one of the passengers had moved to the driver's seat.  The police ultimately discovered handguns on two of the car's

occupants.  The district court suppressed the evidence as fruit of an unlawful seizure, finding that the police officer had seized the vehicle and its occupants without reasonable suspicion.  *Id.* at 628.  The Sixth Circuit affirmed, finding that the passengers' nervousness, the conflicting explanations of who the group had visited in Nashville (doctor or lawyer), and the movement of the passenger into the driver's seat did not add up to a reasonable suspicion of criminal activity.  *Id.* at 631.  Thus, the officer had no reasonable suspicion to keep the occupants of the vehicle after the original purpose of the stop was completed.

In the instant case, Trooper Topp never issued a citation for weaving, which was the purpose of the traffic stop.  However, when he abandoned any questioning or activity relating to the reason for the stop, and instead focused on drugs and the passenger, the purpose for the traffic stop expired, and he required some articulable reasonable suspicion to continue his detention of Daugherty, Ellis, and the truck.  It was as if he had issued a citation, and then turned his attention to drugs, just as in *Richardson*.  Moreover, at the point Trooper Topp abandoned his inquiry into the traffic citation, he had even less reasonable suspicion of criminal activity than did the police officer in *Richardson*.  Neither Daugherty or Ellis displayed the outward signals of nervousness that the *Richardson* passengers did.  Ellis did not get into the driver's seat when Daugherty was out of the truck.  There was no conflict in the stories at that point.  The facts in *Richardson* were far more suggestive of criminal activity than the facts in the instant case, yet the Sixth Circuit affirmed the trial court's determination that there was no reasonable suspicion under the totality of the circumstances.

Indeed, the Sixth Circuit has not found reasonable suspicion in cases where there were far more factors to arouse suspicion.  *See, e.g., United States v. Townsend,* 305 F.3d 537 (6th Cir. 2002) (finding no reasonable suspicion where driver of vehicle: raised his hands in the air as officer

approached; looked back at police car repeatedly while officers were processing paperwork; did not know the address to which he would be arriving at 5:00 a.m.; had three cell phones and a Bible in front seat which was typical of drug couriers; and had rolls of currency in his pockets); *United States v. Mesa*, 62 F.3d 159 (6th Cir. 1999) (finding no reasonable suspicion where passengers appeared nervous when stopped and told conflicting stories about where the grandfather they had just visited lived, and whether he had suffered a heart attack or stroke). Moreover, in the cases where the Sixth Circuit has found reasonable suspicion, there were far more factors suggestive of criminal activity than in the current case. *See, e.g., United States v. Erwin*, 155 F.3d 818 (6th Cir. 1998) (finding reasonable suspicion where: driver was extremely nervous and sweating profusely and his eyes were darting around; once outside his car, driver was attempting to get back in and flee; cushion in backseat was ajar and positioned higher than normal; and pat-down found $846 in loose cash); *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999) (finding reasonable suspicion where: passengers' explanation for their trip was not plausible and appeared rehearsed; driver had rented U-Haul vehicle in cash, consistent with drug smuggling practices; driver was nervous and had shaky hands; passenger was sweating and nervous; floor of U-Haul was littered with used Kleenex, suggestive of cocaine habit; passengers gave inconsistent stories regarding their itinerary; and passengers gave confused response as to how truck had been loaded); *United States v. Valdez*, 2005 U.S. App. LEXIS 21044 (6th Cir. Sept. 26, 2005) (finding reasonable suspicion where: driver could not provide vehicle owner's last name; car was traveling in known drug traffic pattern; driver avoided eye contact with police and rubbed his arms; and driver and passenger told conflicting stories regarding travel plans).

Even if Trooper Topp's questioning of Daugherty were considered within the scope of the original traffic stop, the court concludes that after questioning him for six minutes in the cruiser, there was still no reasonable suspicion of criminal activity sufficient to justify further detention and questioning. When Trooper Topp returned to question Ellis for a second time, it had nothing to do with the traffic stop, and thus there had to be reasonable suspicion to continue the detention. At this point, Trooper Topp identified the following factors as suspicious: Daugherty had forgotten Ellis's name; Daugherty had been paid to take Ellis to and from Cleveland; and Daugherty did not know exactly where he had been in Cleveland. These factors do not add up to reasonable suspicion. Daugherty did not say he did not know Ellis's name, but rather that it had not stuck with him. Since Daugherty knew Ellis's sister, and was effectively acting as a taxi service for Ellis, it is not necessarily suspicious for him to have forgotten his passenger's name. Daugherty was not from Cleveland, and had been following directions from Ellis; thus, it is not surprising that he did not know where in Cleveland he had been. Additionally, Trooper Topp did not testify that this type of arrangement was common for drug couriers. There was no reasonable suspicion for Trooper Topp to detain Daugherty for the purpose of interrogating him about drugs in the vehicle, and there was no reasonable suspicion for Trooper Topp to re-interrogate Ellis, the passenger, after his conversation in the police cruiser with Daugherty. The detention was not reasonable under the particular facts of this case. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Therefore, Trooper Topp's continued detention of Daugherty, Ellis, and the truck well beyond the purposes of the initial traffic stop was an unconstitutional detention and seizure.

### C. Fruit of the Poisonous Tree

-14-

Having concluded that Ellis's continued detention was unconstitutional, the court must determine whether the subsequent search of the truck should be suppressed as fruit of the poisonous tree.  The United States argues that Ellis has no standing to challenge the valid search of the truck, because he had no expectation of privacy in the truck.  They argue, based on *United States v. Padilla*, that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Co-conspirators and codefendants have been accorded no special standing."  508 U.S. 77, 81-82 (1993).  This is a correct statement of the law; under Supreme Court precedent, a passenger ordinarily does not have an expectation of privacy sufficient to create standing to challenge the validity of consent given by a driver of the vehicle.  *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978).  However, it is also true that "a passenger has standing to challenge a search of a car even if he or she did not have a reasonable expectation of privacy in the car itself, where the challenged evidence was discovered as a result of the passenger's unlawful stop, detention, or arrest."  *United States v. McCrimmon*, 2002 U.S. Dist. LEXIS 16471, *12 (E.D. Mich. Aug. 22, 2002) (citing *United States v. Shareef,* 100 F.3d 1491, 1500 (10th Cir. 1996)); *cf. United States v. Carter*, 14 F.3d 1150, 1154 (6th Cir. 1994) (discussing *United States v. Erwin*, 875 F.2d 268, 272 (10th Cir. 1989)).  Therefore, Ellis may not challenge the search or consent directly, but the search and subsequent seizure of the cocaine in the truck must be suppressed if the search and seizure "represented 'fruit' of [Ellis'] unlawful detention."  *Carter*, 14 F.3d at 1154.

The court concludes that the search and seizure of the cocaine was fruit of Ellis's unlawful detention, and that the illegal detention was the proximate cause of the search of the truck.  This case is factually distinguishable from the situation presented in *Carter*.  In *Carter*, police pulled over a

van which had a temporary license plate that could not be checked by radio. *Id.* at 1151. The driver, Locklear, rushed out of the van to the police car and produced his driver's license and identification for the police officer; he appeared nervous and spoke choppily. *Id.* The other police officer engaged the passenger, Carter, in conversation at the side of the van. Carter got out of the van and "kept trying to walk away from the vehicle." *Id.* Meanwhile, the license plate was verified, and the officers told Locklear he was free to go. Before walking away, the officer asked Locklear if he would consent to a search of the vehicle for contraband. Locklear refused, and the officer confined him in the back of the police car. The issue of whether or not Locklear then consented to a search was disputed; however, a subsequent search found 437 pounds of marijuana in the van's trunk. *Id.* at 1152. The Sixth Circuit affirmed the denial of Carter's motion to suppress on several grounds. The court held that as a passenger, Carter had no standing to challenge the validity of the search. *Id.* at 1155. Additionally, even though the court assumed the stop and detention of Carter was illegal, the court rejected his contention that the search be suppressed as fruit of a poisonous tree, finding that:

> It does not follow from any of this, however, that the discovery and seizure of the marijuana represented the 'fruit' of Mr. Carter's unlawful detention. Suppose that at the time of the driver's arrest the police had summoned a taxi cab for Mr. Carter and told him he was free to leave. The marijuana would still have been discovered, because it was located in a van owned and controlled by Mr. Locklear (who was not going anywhere until his vehicle had been searched) and not in a vehicle controlled by Mr. Carter

*Id.* at 1154. The court went on to conclude that "Mr. Carter was not the 'victim' of the search of Mr. Locklear's van. The detention of Carter was not the proximate cause of the search of the van . . ." *Id.* at 1155.

-16-

The court notes that the *Carter* court did not lay down a *per se* rule that a passenger may *never* have standing to challenge a search of a car where the evidence was discovered as a result of the passenger's unlawful detention; rather, the *Carter* court held that under its facts, Carter's detention did not proximately cause the search.  Indeed, the court indicated it had "no quarrel" with *United States v. Durant*, 730 F.2d 1180 (8th Cir. 1984) and its progeny, a case in which incriminating evidence found during an illegal pat-down of the passenger led directly to the search of a vehicle.  Moreover, a *per se* rule would permit the police to unconstitutionally pull over a vehicle, unconstitutionally detain its occupants, unconstitutionally search the car, and then use any evidence found in the car against all passengers except the driver.  Such a rule would condone abhorrent police procedures and eviscerate the protections of the Fourth Amendment.  Thus, if it may be said that a constitutional violation of a passenger's rights led directly to a search, *Carter* does not foreclose suppression of the search as fruit of the poisonous tree.

In the instant case, unlike *Carter*, Ellis's detention *did* cause the search.  In *Carter*, there was no evidence that the police asked the driver Locklear any questions about his passenger.  In the current case, *nearly all* the questioning was related to the passenger Ellis, not Daugherty: how did they know each other? Did the passenger have anything with him? Did the passenger drop anything off?  Did the passenger have any illegal drugs?  In *Carter*, the driver Locklear's behavior was suspicious, and he was arrested, taken to the police station, and charged with drug crimes.   In the current case, the driver Daugherty did not behave suspiciously, was never issued a ticket, and was never arrested or charged with any crime.  In *Carter*, the decision to search the vehicle was a result of the behavior and statements of the driver Locklear, and had little to do with Carter's activity or behavior.  The decision to search was reached soon after Locklear refused to consent and was

-17-

confined to the back of the police car; the only specific suspicious activity by the passenger Carter was an earlier attempt to walk away from the car.  In this case, the decision to search the vehicle had everything to do with Ellis and little or nothing to do with Daugherty.  Trooper Topp decided to search the vehicle shortly after he could not match Ellis's stated name and state of residence to a valid driver's license, and after a second conversation with Ellis allegedly turned up a slightly different version of the trip.  In *Carter*, the court found that the discovery of the drugs was inevitable, even if Carter had not been detained and had been sent home in a cab, because Locklear was under arrest.  In the instant case, however, Daugherty was not under arrest, and the discovery of the drugs was not inevitable in Ellis's absence.  Indeed, while it is unclear whether or not there would have been a search in *Carter* if only Locklear, and not Carter, had been in the car, the court has no doubt that in the current case, without Ellis, Trooper Topp never would have asked Daugherty if there were illegal drugs in the truck or asked to search the truck at all.  Thus, as in *Durant*, the search was as a direct result of Ellis, and the search was proximately caused by his illegal detention.  Unlike in *Carter*, the search was fruit of the passenger's illegal detention.  The results of the search must be suppressed, irrespective of whether Daugherty consented and whether Ellis had standing to contest Daugherty's consent.

Likewise, Ellis's statements and telephone calls, which were the direct result of the illegal search and detention, must also be suppressed.  Assuming, *arguendo*, that Ellis knew the phone call was being monitored and consented to the monitoring, the incriminating statements occurred too close to the illegal detention and search to be valid.  A voluntary action, such as consent, is not necessarily enough to "purge the primary taint of the unlawful invasion."  *See Wong Sun v. United States*, 371 U.S. 471, 486 (1963).  As the Sixth Circuit noted:

-18-

> the Supreme Court has made perfectly clear that the exclusionary rule may operate to exclude evidence obtained as the result of a valid, voluntary consent to search. In order to deter unlawful seizures, the Supreme Court has mandated that courts must generally suppress otherwise admissible evidence obtained as a result of an illegal seizure. *Brown v. Illinois,* 422 U.S. 590, 602, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975).

*United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003). Thus, "not only must the consent be valid . . . but the causal chain between the illegal seizure and the consent must be broken to avoid the consequences of the exclusionary rule." *Id.* (citing *Dunaway v. New York*, 442 U.S. 200, 217-19 (1979)). In evaluating whether the causal chain has been broken, courts should consider "factors such as the length of time between the illegal seizure and the consent, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his *Miranda* rights before he consented." *Id.* at 630. In the instant case, the jailhouse conversation occurred within close proximity to the illegal search. Moreover, there was no significant intervening event to break the chain relative to this conversation. Courts have held that even six hours between the illegal arrest and a subsequent statement is insufficient to break the causal chain absent an intervening event. *Taylor v. Alabama*, 457 U.S. 687, 691 (1982). Additionally, the fact that *Miranda* warnings may have been given "is not by itself sufficient to purge the taint of the illegal arrest." *Id.* at 690; *Brown v. Illinois*, 422 U.S. 590, 602 (1975) (holding that "[i]f *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.") Weighing the factors discussed in *Lopez-Arias*, the court concludes that the causal chain from the illegal detention and search to the jailhouse statement and phone conversation was unbroken. Therefore, the exclusionary rule applies to any statements Defendant made in the hours immediately after his unlawful detention and arrest on

-19-

April 16, 2004, including the oral statement to the police and the incriminating statements made over the telephone.

### III.  CONCLUSION

Any time the court considers granting a motion to suppress, there is a natural hesitation that comes with the possibility that the a potentially guilty defendant will go free.  However, as the Sixth Circuit eloquently noted in its *Mesa* decision:

> Although there is always a temptation in cases of this nature when a substantial quantity of drugs and firearms are found to let the end justify the means, it must be remembered that the courts only see cases in which the conduct of the officer resulted in contraband being found. If the officers had found no drugs in the defendant's car, obviously we would not even know that this traffic stop had ever occurred. Therefore, we must accept that courts will always be "thwarting" what some may view as a good piece of police work when a motion to suppress is granted in cases of this nature. Notwithstanding the importance of drug interdiction, however, we are still charged with the responsibility of seeing that the interdiction occurs without the Constitution being violated. Such was not the case here.

*Mesa*, 62 F.3d at 163.  In the current case, the state trooper detained Daugherty and Ellis well beyond the purposes of the original traffic stop, without any reasonable justification to do so.  While the courts have held that police officers may ask questions of drivers and passengers during the time it takes to write a traffic citation, the courts have never countenanced continuing to ask questions, absent reasonable suspicion, after the abandonment of both the purpose of the stop and the writing of the ticket.  That is what has happened here.  Whether or not the state trooper was motivated by impermissible purposes, such as the differences in race and age between the passengers, is immaterial.  Whatever the motivation, the state trooper's actions violated the Defendant's constitutional rights.  Where, as in this case, illegal detention of a passenger results directly in a search turning up contraband, evidence of that contraband must be suppressed as fruit of the

-20-

poisonous tree.  For all the foregoing reasons, Ellis's Motion to Suppress Tangible Evidence and all

Oral or Written Statements and Derivative Evidence (ECF No. 29) is granted.

IT IS SO ORDERED

/S/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

November 2, 2005